**Andrew M. Calamari**
**Sanjay Wadhwa**
**LeeAnn Gaunt (Not admitted in SDNY)**
**Celeste Chase**
**Alexander M. Vasilescu**
**Daniel M. Loss**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0178 (Vasilescu)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
SECURITIES AND EXCHANGE                )
COMMISSION,                            )
                                       )          ECF CASE
                    Plaintiff,         )
                                       )
          v.                           )
                                       )          COMPLAINT AND
TOWN OF RAMAPO, NEW YORK,              )          JURY DEMAND
RAMAPO LOCAL DEVELOPMENT CORP.,        )
CHRISTOPHER P. ST. LAWRENCE,           )
NACHMAN AARON TROODLER,                )
MICHAEL KLEIN, and                     )
NATHAN OBERMAN                         )
                                       )
                    Defendants.        )
———————————————————————— )

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants Town of Ramapo, New York (the "Town of Ramapo" or the "Town"), Ramapo

Local Development Corporation ("RLDC"), Christopher P. St. Lawrence ("St. Lawrence"),

Nachman Aaron Troodler ("Troodler"), Michael Klein ("Klein"), and Nathan Oberman

("Oberman") (collectively, Defendants"):

## SUMMARY OF ALLEGATIONS

1.      This action concerns numerous fraudulent misrepresentations and omissions about the financial condition of the Town of Ramapo and the RLDC in connection with 16 municipal securities offerings between September 2010 and September 2015.  These offerings are listed in an appendix to this Complaint.

2.      Beginning in 2010, the Town of Ramapo and the RLDC undertook to construct a minor league baseball stadium, now known as Provident Bank Park.  This project (the "Baseball Stadium Project") was politically unpopular and cost at least approximately $60 million, significantly straining municipal finances already impaired by declining sales and property tax revenues.

3.      That financial strain caused Town Supervisor and RLDC President St. Lawrence and the other Defendants to commit the fraud that is the subject of this action, to conceal the true condition of Town and RLDC finances in an attempt to avoid further political fallout from the Baseball Stadium Project.  The object of the fraud was to mask the deterioration of the Town's primary operating fund, *i.e.*, the General Fund, in order to facilitate various bond financings that are set forth in an appendix to this Complaint.  Overall, the Town raised more than $300 million over the period 2010 to 2015 (about $85 million of it "new money") on the basis of materially false representations to investors concerning the financial health and wherewithal of the Town.

4.      In particular, St. Lawrence masterminded and directed a scheme to artificially inflate the balance of the General Fund for at least FY 2009 through FY 2014, by recognizing fraudulent receivables, omitting unpaid liabilities, and improperly recording transfers from other funds with different tax bases.

2

5.      As a result, the Town of Ramapo's General Fund appeared to have a positive

balance when in fact it had a negative balance for each of those years.  The discrepancy between

the reported General Fund balance and the Town of Ramapo's actual General Fund balance for

FY 2009 through FY 2014 is depicted in the chart below:



6.      For FY 2009 through FY 2014, the Town reported positive General Fund

balances ranging between $1,435,910 and $4,110,584 when its actual General Fund balances

were negative, ranging between -$249,416 and -$13,958,241.

7.      Klein, the Town Attorney, participated in the scheme to inflate the General Fund

balance by, among other things, helping to conceal outstanding liabilities relating to the Baseball

Stadium Project and by making repeated misleading representations to the Town's auditors

concerning the collection of a $3.08 million receivable recorded for the sale of a 13.7-acre parcel

of land to the RLDC. Because title to the property was never transferred from the Town to the RLDC, Klein also made misleading statements about the receivable's source.

8.      Troodler, formerly the RLDC's Executive Director and an Assistant Town Attorney, participated in the scheme to inflate the General Fund balance by, among other things, certifying official statements that contained a fraudulent $3.08 million receivable and an additional fabricated $3.66 million receivable for a purported transfer of land from the Town to the RLDC. The only land transferred from the Town to the RLDC during the time of the purported $3.66 million transaction was a property donated for the baseball stadium, which Troodler and St. Lawrence knew did not impose any payment obligation on the RLDC. Troodler also helped to conceal the fraudulent nature of the $3.08 million receivable by approving RLDC financial statements that reflected a purchase of property from the Town that never took place.

9.      Oberman, the Town's Deputy Finance Director, participated in the scheme to inflate the General Fund balance by, among other things, directing improper transfers from the Ambulance Fund to the General Fund totaling $12.4 million between FY 2009 and FY 2014.

10.     The inflated General Fund balances were included in offering documents used to market Town of Ramapo and RLDC-issued bonds to investors, who considered the condition of the General Fund a significant factor when making their investment decisions.

11.     St. Lawrence, Troodler, and Klein signed false representations in connection with certain of the bond issues indicating that, to the best of their knowledge, the offering documents did not contain material misstatements or omissions.

12.     St. Lawrence, with Oberman's assent, also knowingly provided inaccurate information about the balance of the General Fund to a credit rating agency that assigned ratings to bonds issued by the Town of Ramapo and the RLDC.

13.     Immediately after a teleconference with the rating agency in January 2013 in which St. Lawrence represented that for FY 2012, the Town experienced "a stable balance [of $2,004,151] in the General Fund," St. Lawrence directed Town employees to complete an upcoming "refinancing of the short-term debt as fast as possible, because . . . **we're going to have to all be magicians to get to . . . those numbers**."

14.     St. Lawrence and Troodler also endeavored to conceal from investors that the RLDC's operating revenues were insufficient to cover debt service on bonds that the RLDC issued in April 2011 and refinanced in February 2013 to pay for a portion of the baseball stadium's construction (the "Stadium Bonds").

15.     Because the Stadium Bonds were guaranteed by the Town of Ramapo, St. Lawrence's and Troodler's concealment of the RLDC's revenue shortfall masked the likelihood that the RLDC's debt service payments would need to be subsidized by the Town and, in turn, result in further deterioration of the General Fund.

16.     By virtue of the conduct alleged herein:  (A) each of the Town of Ramapo, the RLDC, St. Lawrence, Troodler, and Klein, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)]; (B) Oberman has violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and 10b5-(c) thereunder; (C) St. Lawrence and Troodler are liable under Section 20(a) of the Exchange Act as controlling persons for the violations of the RLDC, and St. Lawrence for the violations of the Town, under Sections 17(a)(1), (2), and (3) of the Securities

Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; (D) St. Lawrence, Troodler, Klein, Oberman, and the RLDC aided and abetted the violations of the Town of Ramapo under Section 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; and (E) St. Lawrence, Troodler, Klein, Oberman, and the Town of Ramapo aided and abetted the violations of the RLDC under Section 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder.

17.     Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

18.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] seeking to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  The Commission also seeks conduct-based injunctions and undertakings against the Defendants, including an order:

- requiring the Town of Ramapo and the RLDC to retain a Court-Appointed Independent Consultant to review and recommend improvements to their financial reporting and municipal security disclosure policies, procedures, and controls and to monitor their mandated implementation of such recommendations for a period of five years;

- requiring the Town of Ramapo and the RLDC, for a period of five years, to retain an Independent Auditing Firm not unacceptable to the Commission staff to conduct audits of their annual financial statements;

- prohibiting the Town of Ramapo and the RLDC, for a period five years, from engaging in the offer or sale of their own municipal securities unless, prior to doing so, they retain and cooperate with an Independent Disclosure Counsel not unacceptable to the Commission staff; and

- prohibiting St. Lawrence, Troodler, Klein, and Oberman from participating in any offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security.

19.     The Commission also seeks a final judgment ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Finally, the Commission seeks any other equitable relief that the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise to the alleged violations occurred in the

Southern District of New York.  For instance, the Town of Ramapo is located in Rockland County, New York and the RLDC's principal place of business in located in Rockland County, New York.

**DEFENDANTS**

22.     The Town of Ramapo is an incorporated municipal government in Rockland County.  The Town of Ramapo entered into agreements with the Commission to toll any applicable statute of limitations for the period July 10, 2015 through January 9, 2016 and the period March 1, 2016 through April 26, 2016.

23.     The RLDC is a not-for-profit corporation established in 2008 for the purpose of engaging in development projects within the Town of Ramapo.  The RLDC is a component unit of the Town but operates independently of the Town.  The RLDC entered into agreements with the Commission to toll any applicable statute of limitations for the period July 10, 2015 through January 9, 2016 and the period March 1, 2016 through April 26, 2016.

24.     St. Lawrence, age 65, resides in Suffern, New York.  He is the Supervisor and Director of Finance of the Town of Ramapo and the President of the RLDC.  St. Lawrence asserted his Fifth Amendment right not to testify during investigative testimony.  St. Lawrence entered into agreements with the Commission to toll any applicable statute of limitations for the period August 21, 2015 through February 20, 2016 and the period March 1, 2016 through April 26, 2016.

25.     Troodler, age 42, resides in Bala Cynwyd, Pennsylvania.  He was the Executive Director of the RLDC and an Assistant Town Attorney for the Town of Ramapo from 2008 to 2015.  He has been a member of the New York bar since 2000.

26.     Klein, age 62, resides in Airmont, New York.  He is the Town Attorney for the Town of Ramapo.  He has been a member of the New York bar since 1979.

27.     Oberman, age 87, resides in Suffern, New York.  He is the Deputy Finance Director and Receiver of Taxes for the Town of Ramapo.  He asserted his Fifth Amendment right not to testify during investigative testimony.  Oberman entered into agreements with the Commission to toll any applicable statute of limitations for the period August 14, 2015 through February 13, 2016 and the period March 1, 2016 through April 26, 2016.

## THE DEFENDANTS' VIOLATIVE CONDUCT

### Background regarding the General Fund

28.     The General Fund is the primary operating fund of the Town of Ramapo.  Tax revenues and other receipts that are not allocated by law or contractual agreement to another fund are accounted for in the General Fund.

29.     Financial statements for governmental funds, including the General Fund, focus on near-term inflows and outflows of spendable resources.

30.     Investors in municipal securities issued or guaranteed by the Town of Ramapo gave significant attention to the condition of the General Fund.

31.     The Defendants knew that the credit rating agency that rated securities issued by the Town and the RLDC also focused on the balance of the General Fund and trends relating to the same.

32.     As of fiscal year-end 2008, the Town reported a General Fund balance of $4,501,666, with its adopted budgets for FY 2009 and FY 2010 projecting continued annual surpluses.  Following the onset of the financial crisis in 2008, however, property and sales tax

revenues declined, and for FY 2009, such tax revenues came in at $3.6 million under budget for the General Fund.

33.     Beginning in FY 2009, pressure on the Town's finances also resulted from increased debt service payments stemming from bonds issued to finance various projects, including the purchase of land for the Baseball Stadium Project.

34.     In late 2009, a CPA employed in the Town's Finance Department prepared analyses of the anticipated FY 2009 General Fund results for St. Lawrence and Oberman.  The analyses showed that the General Fund was expected to end the fiscal year with a balance of between approximately $500,000 and $1,000,000.  This represented a 75% decline from the prior year and the first decline in General Fund reserves in five years.

35.     In November 2009, the Finance Department employee reminded Oberman that the Finance Department's review of the "actual amounts (2009) for the General fund" showed that it would be "difficult to attain" the General Fund results that had previously been budgeted for FY 2009 and FY 2010.

**The $3,080,000 Receivable**

36.     To plug most of the hole in the General Fund for FY 2009, St. Lawrence and Oberman approved recording a $3,080,000 receivable in the General Fund.  The receivable was purportedly for a sale by the Town of Ramapo of a 13.7 acre parcel of land known as the Hamlets to the RLDC.

37.     The notes to the Town of Ramapo's FY 2009 financial statements, for which St. Lawrence and Oberman signed a management representation letter, also stated that the $3,080,000 receivable was for "amounts due from the [RLDC] for the sale of land."

38.     In fact, Defendants knew that the Town did not complete a sale of the Hamlets to the RLDC as of FY 2009 or even as of the issuance of the Town's FY 2009 financial statements on July 20, 2010.

39.     Title to the Hamlets never transferred to the RLDC.  Nevertheless, transfer of the Hamlets property by the Town to the RLDC was reported in their respective FY 2009 financial statements.

40.     Recording the fictitious sale of the Hamlets appeared to boost the FY 2009 balance of the Town's General Fund by $3,080,000.

41.     During an audit of the Town of Ramapo's FY 2010 financial statements in early 2011, the auditors told St. Lawrence, Klein, and Oberman that the failure to close the Hamlets sale required reversing the $3,080,000 receivable in the General Fund.

42.     Because St. Lawrence did not want to take the $3,080,000 receivable off the books of the General Fund, he contrived with Klein's assistance and Oberman's assent to "match" the amount of the receivable to a transaction involving a different parcel of land in the vicinity of Elm Street.

43.     In fact, Defendants knew that the Town of Ramapo had already donated the Elm Street land to the RLDC in 2009 for a housing project known as Ramapo Commons.

44.     In May 2011, Klein, knowingly or with reckless disregard, falsely claimed to the Town's auditors that the $3,080,000 receivable was derived from the transfer of the Elm Street land.  He claimed that the $3,080,000 amount was based on an agreement by the RLDC to reimburse the Town of Ramapo for the Town's $7.5 million acquisition cost of the Elm Street property (the "Elm Street Reimbursement Agreement").

45.     Klein had previously claimed that the $3,080,000 amount represented the purchase price for the Hamlets.

46.     The Elm Street Reimbursement Agreement contained no mention of $3,080,000 and deferred any payment by the RLDC until an undetermined future time after, among other things, the sale of substantially all of 132 units at Ramapo Commons.  It also permitted the RLDC to provide services to the Town of Ramapo in lieu of any reimbursement payment and contemplated a waiver of the agreement "in any instance where the RLDC is unable to repay" the Elm Street acquisition cost.

47.     In early 2011, an employee of the RLDC acknowledged to a junior member of the audit team that "there was no intention" on the part of the RLDC "of paying [$3,080,000 to the Town] in the near future."

48.     In order to procure the auditors' approval for $3,080,000 receivable in the General Fund for FY 2010, Defendants knew that the auditors required assurances that the receivable would be collected in substantial part within the 2011 calendar year.

49.     In about May 2011, St. Lawrence and Klein (based on information provided by St. Lawrence) knowingly, or with reckless disregard, falsely represented to the auditors that the RLDC would pay $1,080,000 of the $3,080,000 "imminently" and the $2,000,000 balance by the end of 2011.

50.     Around that time, St. Lawrence also knowingly, or with reckless disregard, falsely told the Town's auditors that the RLDC had been very successful in selling units at Ramapo Commons, the proceeds from which he said the RLDC planned to pay the Town.  In fact, the RLDC had not yet closed on the sale of a single housing unit at the Ramapo Commons project and had no other source of revenue because the baseball stadium had yet to open.

51.     The Town's FY 2010 financial statements, for which St. Lawrence signed a management representation letter, continued to recognize a $3,080,000 receivable in the General Fund even though the contemplated Hamlets sale on which it was based had not occurred and even though the relationship of the receivable to the Elm Street Reimbursement Agreement was a sham.

52.     Contrary to St. Lawrence's and Klein's representations to the Town's auditors, the RLDC did not make any payment toward the $3,080,000 in 2011.

53.     In early 2012, with the entire $3,080,000 still outstanding, Defendants knew, or recklessly disregarded, that the Town's auditors would not agree to keep the receivable as an asset in the General Fund for FY 2011 without further assurances that it would be collected in substantial part within the 2012 calendar year.  Based on the pace of sales at Ramapo Commons, Defendants knew or recklessly disregarded that such a timetable was not realistic.

54.     Nevertheless, St. Lawrence and Klein (based on information provided by St. Lawrence) knowingly, or with reckless disregard, falsely represented to the Town's auditors that the RLDC would pay the Town $1,000,000 within the 2012 calendar year and the remaining $2,080,000 by the end of 2013.

55.     The Town's FY 2011 financial statements, for which St. Lawrence signed a management representation letter, continued to report the $3,080,000 receivable an asset in the General Fund.  The Town's FY 2011 financial statements also falsely claimed that the $3,080,000 receivable was due from the RLDC for "various services and reimbursable amounts."

56.     Contrary to St. Lawrence's and Klein's representations to the auditors, none of the $3,080,000 was paid by the end of 2012 or 2013.

57.     In 2013, Klein privately acknowledged to a colleague that his representations to the auditors regarding the $3,080,000 receivable had "pushed a gray area too far."

58.     In May 2013, Oberman acknowledged to an agent from the U.S. Department of the Treasury, in reference to the $3,080,000 receivable, that the Town of Ramapo had been carrying an asset on its balance sheet for several years that "should not be there."

59.     In communications with the Town's auditors around the summer of 2013, with the $3,080,000 receivable still outstanding, St. Lawrence attributed the delay in payment by the RLDC to a purported refusal by the New York Attorney General's Office to approve closings of Ramapo Commons units in individual phases, which was untrue.

60.     For FY 2012 through FY 2014, the auditors required that the receivable be denominated as a nonspendable component of fund balance.[1]

61.     Nevertheless, the total General Fund balance remained overstated because it was not proper to include a receivable for proceeds from a sale of the Hamlets that never took place.

62.     The Town and the RLDC have never restated their FY 2009 through FY 2014 financial statements to reflect that the sale of the Hamlets did not occur.  St. Lawrence, Oberman, and Troodler signed management representation letters for certain such financial statements.  St. Lawrence, Oberman, and Troodler also approved Management's Discussion & Analysis sections for certain such financial statements, which were incorporated in official statements for 16 securities offerings by the Town or the RLDC between September 2010 and September 2015.

63.     Between September 2010 and September 2015, official statements or placement memoranda for 14 securities offerings by the Town of Ramapo overstated the balance of the General Fund through inclusion of the $3,080,000 receivable.[2]

---

[1]          The receivable was reduced to $2.5 million in FY 2014.

64.     St. Lawrence signed closing certificates for such offerings by the Town of Ramapo falsely stating that, to the best of his knowledge, the offering documents did not contain material misstatements or omissions.

65.     In connection with one such offering by the Town, Klein knowingly, or with reckless disregard, signed an opinion letter dated December 3, 2012 that falsely represented to the underwriter that "nothing ha[d] come to his attention" to cause him to believe that an official statement dated November 28, 2012 contained any untrue statement of material fact or any material omission.

66.     Official statements for two additional securities offerings by the RLDC, in April 2011 and February 2013, also overstated the balance of the Town's General Fund through inclusion of the $3,080,000 receivable.

67.     Troodler knowingly, or with reckless disregard, signed false closing certificates for such offerings by the RLDC falsely stating that, to the best of his knowledge, the offering documents did not contain any material misstatements or omissions.

**The $3,663,547 Receivable**

68.     In August 2010, St. Lawrence knowingly, or with reckless disregard, falsely represented to a credit rating agency assigning a rating to the Town's bonds that the General Fund was expected to end FY 2010 with a stable balance (*i.e.*, approximately $4 million).  In fact, a contemporaneous internal analysis prepared for St. Lawrence projected a FY 2010 General Fund balance of just $263,883.

69.     In March 2011, the credit rating agency requested unaudited FY 2010 results in connection with its rating on the Stadium Bonds.

---

2          Reduced to $2.5 million in official statements for the Town's March 2015 and September 2015 offerings.

70.     St. Lawrence then knowingly, or with reckless disregard, fabricated a new receivable in the General Fund for FY 2010 in the amount of $3,663,547, which was included, in addition to the $3,080,000 receivable, in unaudited fund balance results provided to the credit rating agency.

71.     The preliminary official statement and final official statement for the Stadium Bonds also falsely stated that the "Adjusted Fund Balance" of the General Fund for FY 2010 was $3,011,117, which included the fraudulent $3,663,547 receivable in addition to the fraudulent $3,080,000 receivable.  Furthermore, the preliminary official statement and final official statement falsely stated that the $3,663,547 receivable "stemm[ed] from the transfer of land to the [RLDC] by the Town."

72.     In fact, the only land transferred from the Town of Ramapo to the RLDC since the end of FY 2009 was a property donated for the baseball stadium.

73.     St. Lawrence and Troodler had arranged for this donation in November 2010 and therefore knew, or recklessly disregarded, that the transaction did not impose any payment obligation on the RLDC.

74.     Nevertheless, Troodler knowingly, or with reckless disregard, signed a false closing certificate for the Stadium Bonds indicating that, to the best of his knowledge, the final official statement did not contain any untrue statement of material fact or any material omission.

75.     St. Lawrence and Troodler also signed a bond purchase agreement for the Stadium Bonds dated April 15, 2011, knowingly, or with reckless disregard, representing to the underwriter that the preliminary official statement and final official statement did not contain any untrue statement of material fact or any material omission.

76.     The $3,663,547 receivable was never actually recorded in the Town's books and records and was not reflected in the Town's audited FY 2010 financial statements, which were issued just several weeks after issuance of the Stadium Bonds.

**The $314,000 Receivable**

77.     Although the Town's audited financial statements for FY 2010 did not include the $3,663,547 receivable, St. Lawrence manufactured other ways to artificially inflate the FY 2010 General Fund balance.

78.     For example, the Town's FY 2010 financial statements prematurely recognized a $314,000 receivable in the General Fund for a contemplated – but unconsummated – sale of property to the Rockland County Sewer District, of which St. Lawrence was also chairman.

79.     Recording this sale transaction before it took place improperly boosted the FY 2010 balance of the Town's General Fund by $314,000.

80.     Preliminary official statements and final official statements for four securities offerings by the Town between June 2011 and May 2012 overstated the FY 2010 balance of the Town's General Fund through, among other things, inclusion of the $314,000 receivable.

81.     St. Lawrence knowingly, or with reckless disregard, signed false closing certificates for each such offering representing that, to the best of his knowledge, the official statements were free of material misstatements or omissions.

**The $12 million Interfund Transfers**

82.     Without a $3,663,547 receivable, the Town plugged much of the deficit in the FY 2010 General Fund with improper transfers from the Ambulance Fund.

83.     Between FY 2009 and FY 2014, the Town used improper transfers from the Ambulance Fund to inflate General Fund reserves.  Directed by St. Lawrence and Oberman,

these transfers were in amounts ranging between $1,280,000 and $2,410,960 each year.  The cumulative impact of these transfers on the balance of the General Fund ranged from $1,280,000 in FY 2009 to more than $12 million in FY 2014.

84.     During the relevant period, the tax base from which General Fund monies were raised did not include clergy residences owned by religious corporations, whereas the tax base from which Ambulance Fund monies were raised did include such properties.  Therefore, the Ambulance Fund had a different tax base from the General Fund.

85.     St. Lawrence and Oberman approved transfers from the Ambulance Fund to the General Fund even though they knew or were reckless in not knowing that the Ambulance Fund and the General Fund had different tax bases and therefore that the transfers were not permitted by law.

86.     St. Lawrence was aware that the Ambulance Fund and General Fund had different tax bases because he signed an annual "Supervisor's Statement" showing the assessed values of the funds.

87.     Nevertheless, on multiple occasions, St. Lawrence knowingly, or recklessly, falsely claimed to the Town's auditors that the General Fund and the Ambulance Fund shared the same tax base.

88.     Employees in the Town's Finance Department also voiced concerns to Oberman and Klein that the transfers from the Ambulance Fund to the General Fund were improper.

89.     In 2014, St. Lawrence acknowledged to other members of the Town Board and Klein that he used the Ambulance Fund as a slush fund for the General Fund.

90.     Between September 2010 and September 2015, preliminary and final official statements or placement memoranda for 16 securities offerings by the Town of Ramapo and the

18

RLDC overstated the balance of the General Fund by including improper interfund transfers.  St.
Lawrence, Troodler, and Klein each knowingly or recklessly made false representations in
connection with certain of these bond issues that, to the best of their knowledge, the offering
documents were free of material misstatements or omissions.

91.     Between FY 2010 and FY 2014, a significant portion of the transfers from the
Ambulance Fund, ranging between $450,000 and $1,424,609 each year, was also prematurely
recorded, before the Ambulance Fund was able to provide those cash amounts.

92.     In order to record the transfers in the fiscal year preceding the actual receipt of
cash by the General Fund, St. Lawrence and Oberman knowingly, or with reckless disregard,
improperly directed that these anticipated future cash receipts be included on the General Fund's
balance sheet as interfund balances "due from" the Ambulance Fund to the General Fund.  This
was a false statement because no obligation, in fact, existed between the two funds.

93.     Interfund balances are appropriate to record when moneys are owed between
funds, such as for services provided or loans.  However, in this case, the Ambulance Fund had no
obligation to the General Fund nor did the General Fund have a claim to the cash in the
Ambulance Fund as of the end of each applicable fiscal year.  As a result, the Town disguised an
anticipated improper flow of assets from the Ambulance Fund to the General Fund as a
legitimate entitlement to such assets by the General Fund.

94.     Between September 2010 and September 2015, preliminary and final official
statements or placement memoranda for 16 securities offerings by the Town of Ramapo and the
RLDC overstated the balance of the General Fund by including these improper interfund
balances.  St. Lawrence, Troodler, and Klein each knowingly or recklessly made false

representations in connection with certain of these bond issues that, to the best of their knowledge, the offering documents were free of material misstatements or omissions.

**Unrecorded Liabilities**

95.     From FY 2011 through FY 2014, the financial statements for the Town's General Fund improperly omitted an accounts payable owed to the engineer for the Baseball Stadium Project of at least $767,224.

96.     During this period, Klein was in possession of the unpaid invoices but did not forward them to the Town's bookkeeping personnel.

97.     When an accountant in the Town's Finance Department raised the issue of the unpaid invoices with Oberman, Oberman also did nothing to correct the Town's accounting records.

98.     St. Lawrence knew how much was owed to the stadium engineer and knew or was reckless in not knowing that the liability was not recorded on the Town's financial statements.

99.     Between September 2012 and May 2013, offering documents for four bond issues by the Town and one bond issue by the RLDC inflated the balance of the General Fund through omission of the liability owed to the stadium engineer.

100.     In FY 2010, RLDC financial statements, which were also incorporated into the Town's financial statements in summary form, omitted a separate liability in excess of $700,000 relating to legal fees for the Baseball Stadium Project.

101.     The RLDC continued to omit liabilities for certain legal fees from its financial statements in at least FY 2011 and FY 2012.

102.     According the RLDC's bookkeeper, the RLDC had a practice of "never put[ting] [legal counsel's] outstanding bills on [the] books."

103.    Upon learning of this practice, Troodler remarked to the bookkeeper, "Apparently you have a touch of [St. Lawrence] in you, who knew?"

104.    Between June 2011 and May 2014, offering documents for eight bond issues by the Town and two bond issues by the RLDC inflated the net assets of the RLDC through the omission of liabilities owed to legal counsel.

**The $3,145,503 Receivable**

105.    In connection with bond offerings by the Town and RLDC in late 2012 and early 2013, St. Lawrence repeatedly represented to the credit rating agency and the underwriter for certain bond offerings that the General Fund was estimated to end FY 2012 with "no change" from the prior year's $2,004,151 balance.  St. Lawrence knew, or recklessly disregarded, that these representations to the credit rating agency and the underwriter were false.

106.    These representations contradicted contemporaneous internal analyses prepared for St. Lawrence estimating a substantially negative fund balance.

107.    In January 2013, an employee in the Town's Finance Department reminded St. Lawrence and Oberman that her records for FY 2012 were inconsistent with the estimates that had been given to the credit rating agency.

108.    Nevertheless, on January 25, 2013, St. Lawrence told the credit rating agency on a phone call that for FY 2012 the Town experienced "increased fund balances across the board, and a stable balance in the general fund."  Oberman was also present for the call.

109.    Immediately after the call with the rating agency, St. Lawrence directed Town of Ramapo officials including Oberman, "Listen I'm going to tell you this right now.  We need to do this [upcoming] refinancing of the short term debt as fast as possible, because . . . we're going to have to all be magicians to get to some of those numbers."

110.     By early May 2013, the preliminary work of the Town's auditors reflected an FY 2012 General Fund balance of negative $2,550,469, not the $2,004,151 positive fund balance St. Lawrence had claimed to the credit rating agency.

111.     St. Lawrence then sought to delay release of the Town's financial statements until after June 30, by which time certain anticipated securities issuances were expected to be completed.

112.     St. Lawrence's plans to conceal the FY 2012 fund balance from investors grew more complicated after execution of a search warrant at Ramapo Town Hall by the FBI on May 15, 2013.  That development caused the placement agent and special disclosure counsel for an issuance of bond anticipation notes ("BANs") by the Town to request unaudited FY 2012 General Fund results to include in the offering document.

113.     The request for unaudited FY 2012 results prompted St. Lawrence to create a new, inflated receivable of $3,145,503 in the General Fund (without reporting any of the $3,145,503 as deferred revenue) so that the unaudited fund balance appeared to be more consistent with the previous representation made to the credit rating agency.

114.     St. Lawrence, knowingly or with reckless disregard, falsely represented to the placement agent for the BAN offering that the $3,145,503 amount constituted reimbursements "to be received" from FEMA for expenses incurred as a result of Hurricanes Sandy and Irene. Klein arranged for unaudited results reflecting the $3,145,503 receivable to be sent to the placement agent, along with St. Lawrence's representation that the $3,145,503 was for reimbursements "to be received" from FEMA.

115.     However, other Town personnel had previously informed St. Lawrence, as well as Klein, that the $3,145,503 amount was in substantial part for claims that had not yet been

22

submitted and/or might never be approved by FEMA.  As of May 13, 2013, an internal tracking sheet routinely shared with St. Lawrence and Klein reflected that the Town "anticipated" reimbursement from FEMA of less than $800,000 for expenses relating to Hurricanes Sandy and Irene.  Therefore, the representation that $3,145,503 was "to be received" from FEMA was false.

116.   Among other requirements, properly recording a receivable for FEMA reimbursement in the General Fund for FY 2012 would have required that the General Fund actually incur the expenses in FY 2012 for which the reimbursement was being sought.  St. Lawrence and Klein knew, or recklessly disregarded, that the $3,145,503 amount consisted primarily of expenses that either had not been incurred in FY 2012 or that had been incurred by a different fund.

117.   Even if the $3,145,503 amount had been incurred by the General Fund in FY 2012 (which it was not), it would have been improper to record the receivable without deferring the revenue (and therefore creating an offsetting liability).  That is because, according to the Town's financial statements, revenue is not recognized unless, among other things, it is collected within 90 days following the end of the applicable fiscal year.

118.   St. Lawrence and Klein knew, or recklessly disregarded, the applicability of this 90-day availability criterion, which was discussed in the Town's annual financial statements.  St. Lawrence and Klein also knew, or recklessly disregarded, that none of the $3,145,503 had been collected as of the date of the May 2013 placement memorandum, which was more than 90 days after the end of FY 2012.

119.   On May 21, 2013, St. Lawrence participated in a call with the Town's auditors regarding the unaudited FY 2012 results, which included the $3,145,503 receivable (without

corresponding deferred revenue).  The auditors were unable to provide any comfort concerning

the validity of these numbers, which they had just received from St. Lawrence that day.

120.    Nevertheless, the placement memorandum for the BAN offering stated that the

FY 2012 general fund balance was $1,495,034, including the $3,145,503 receivable.  The

placement memorandum also stated that the $3,145,503 was "to be received" from FEMA.  St.

Lawrence, knowingly or with reckless disregard, signed a false closing certificate representing

that the placement memorandum did not contain any untrue statement of material fact or any

material omission.

121.    In June 2013, the Office of the New York State Comptroller released a report

identifying the Town as one of the state's most fiscally distressed municipalities based in part on

information concerning the FY 2012 General Fund balance provided by an employee in the

Town's Finance Department.

122.    After release of that report, Klein publicly announced that the employee's

numbers were flawed because they omitted $3.5 million in revenue, a figure that included the

fraudulent $3,145,503 receivable.

123.    When the Town of Ramapo released its audited financial statements for FY 2012,

the $3,145,503 receivable was reduced to only about $743,338.

124.    Including the $743,338 as an asset in the Town's General Fund without deferring

the revenue was still improper because, although that amount was for expenses incurred in FY

2012, none of it had been collected within 90-days following the conclusion of FY 2012.

Therefore, it fell outside the applicable availability window.

125.    In May 2014, a placement memorandum for a BAN offering by the Town

overstated the balance of its FY 2012 General Fund by, among other things, including the

$743,338 receivable.  St. Lawrence, knowingly or with reckless disregard, signed a false

certificate that that the placement memorandum did not contain any untrue statement of material

fact or any material omission.

**Concealment of the Baseball Project's Costs**

126.    In addition to fraudulently overstating the General Fund, St. Lawrence and

Troodler engaged in a scheme to understate the anticipated impact of the Baseball Stadium

Project on future General Fund reserves.

127.    In August 2010, Town voters overwhelmingly defeated a proposed guarantee of

long-term bonds that were to be issued by the RLDC to finance construction of the baseball

stadium.

128.    The Town Board subsequently approved a guarantee of the Stadium Bonds, which

originally had a five-year maturity schedule that avoided the referendum requirement applicable

to longer-term financing.

129.    In the wake of political opposition to the Town's guarantee of financing for the

Baseball Stadium Project, St. Lawrence repeatedly claimed in public statements and in

communications with the credit rating agency and underwriter that the RLDC would be able to

meet its financial commitments and that the RLDC's debt would be self-supporting.

130.    In April 2011, the preliminary official statement and final official statement for

the Stadium Bonds issued by the RLDC represented that, while the Town had financed the

baseball stadium property's $8 million acquisition cost and spent $6 million in "horizontal" site

and field work, the $25 million Stadium Bonds would "fulfill the balance of financing needs" for

the Baseball Stadium Project.

131.     This implied that the "vertical" construction costs – for which Stadium Bond proceeds were being used – would not exceed $25 million and that the total cost of the Baseball Stadium Project – including the land and horizontal improvements previously financed by the Town – would not exceed $39 million.

132.     In actuality, the RLDC, including St. Lawrence, had been informed that "vertical" construction costs alone would range between at least $35 million and $40 million.

133.     Troodler also knew or recklessly disregarded that the Baseball Stadium Project's costs were expected to exceed the amounts represented in the preliminary official statement and final official statement for the Stadium Bonds.

134.     Nevertheless, St. Lawrence and Troodler signed a bond purchase agreement representing to the underwriter of the Stadium Bonds that the preliminary official statement and final official statement did not contain any untrue statement of material fact or any material omission.  Troodler also signed a closing certificate representing the same, to the best of his knowledge.

135.     As it turned out, the Baseball Stadium Project's land, site, and construction costs totaled at least approximately $60 million, more than a 50% increase from the $39 million implied in the official statement.

136.     Most of that additional cost was financed through Town-issued general obligation bond proceeds, whose repayment portends significant strain on General Fund reserves for years to come.

137.     The foreseeability of this result as of April 2011 was concealed from investors through the false representation that the Stadium Bonds would "fulfill the balance of financing needs" for the Baseball Stadium Project.

**Concealment of the RLDC's Operating Revenue Shortfall**

138.    The Stadium Bonds had a "direct pay" guarantee structure so that the Town of Ramapo, as guarantor, would make the payments of interest and principal to bondholders and receive reimbursement for those payments from the RLDC, which issued the bonds.  In April 2011, the official statement for the Stadium Bonds stated that the RLDC was expected to reimburse the Town in full for the interest and principal payments out of the RLDC's Baseball Stadium Project and Ramapo Commons housing project revenues.

139.    That purported expectation was premised on the stale and knowingly false assumptions regarding construction costs and on projected Baseball Stadium Project revenues of $1.8 million annually, which without any evident basis substantially exceeded the revenues projected in a feasibility study.

140.    In May 2012, a credit rating agency rating the Town's debt requested that the RLDC update its stadium revenue projections.  Draft projections prepared for St. Lawrence by the RLDC's financial advisor reflected an expectation that the RLDC would generate insufficient revenues to reimburse the Town for annual debt service on the Stadium Bonds.  These projections were not disclosed to the rating agency.  Instead, St. Lawrence claimed that, going forward, the stadium was expected to generate an average of $3.4 million in revenue annually (*i.e.*, nearly twice the projected amount in the financial advisor's draft), including $1.9 million for concerts and events (*i.e.*, more than three-times the financial advisor's draft projections).

141.    In fact, the stadium generated just about $768,107 of gross revenue in its first year of operation (FY 2011), including $734,102 of baseball revenue and $34,005 of event revenue, and has never generated more than $1.3 million in gross revenue in any year.

142.     With a $1,937,500 payment of principal and interest due on March 15, 2012, the RLDC's revenue shortfall resulted in a scramble by St. Lawrence and Troodler to find funds to reimburse the Town for the debt service payment.  Ultimately, the RLDC was only able to satisfy its obligation by drawing down on a line of credit at St. Lawrence's direction.

143.     In September 2012, St. Lawrence and Troodler had to scramble again for the RLDC to find funds to cover reimbursement of the interest payment.  Accordingly, St. Lawrence and Troodler arranged for a round-trip transfer of funds between the RLDC and the Town. Specifically, the Town of Ramapo transferred more than $500,000 to the RLDC and the RLDC used such funds to reimburse the Town for the $411,250 interest payment due on the Stadium Bonds.

144.     Without the Town's subsidy, the RLDC would not have been able to reimburse the Town for its interest payment.

145.     In November 2012, an analysis performed for St. Lawrence and Klein by the financial advisor to the Town and RLDC concluded that the RLDC's revenue shortfall warranted restructuring the Stadium Bonds to extend their maturity date from 2016 to 2041 so that more of the annual debt service could be covered "by the operation of the RLDC."

146.     St. Lawrence and Troodler were directly familiar with the revenue shortfall, having resorted to borrowed funds and Town subsidies for the RLDC to satisfy its debt service reimbursements on the Stadium Bonds.

147.     Nevertheless, at St. Lawrence's direction, an official statement dated November 28, 2012 for an issue of Town bonds falsely stated that the Town had "been fully reimbursed by the [RLDC] for . . . interest and principal amounts [due in 2012 on the Stadium Bonds] for a total

of $2,348,750 utilizing the operating revenues of the [LDC]." In fact, much of the money used by the RLDC to make principal and interest payments had not come from operating revenues.

148. St. Lawrence knowingly, or with reckless disregard, signed a closing certificate dated December 3, 2012 falsely representing that, to the best of his knowledge, the November 28, 2012 official statement did not contain any untrue statement of material fact or any material omission.

149. Klein also knowingly, or with reckless disregard, signed an opinion letter for the November 2012 issue falsely representing that nothing had come to his attention to cause him to believe that the official statement contained any untrue statement of material fact or any material omission.

150. In February 2013, the preliminary official statement and final official statement for an issue of bonds by the RLDC to refund the original Stadium Bonds and extend their maturity schedule (the "Refinanced Stadium Bonds") repeated the false statement that the Town had "been fully reimbursed by the [RLDC] for . . . interest and principal amounts [due in 2012 on the Stadium Bonds] for a total of $2,348,750 utilizing the operating revenues of the [RLDC]."

151. St. Lawrence and Troodler signed a bond purchase agreement for the Refinanced Stadium Bonds dated February 7, 2013, knowingly, or with reckless disregard, representing to the underwriter that the preliminary official statement and final official statement did not contain any untrue statement of material fact or any material omission. Troodler, knowingly, or with reckless disregard, signed a false closing certificate for the Refinanced Stadium Bonds indicating that, to the best of his knowledge, the final official statement was free of material misstatements and omissions.

152.   St. Lawrence also knowingly, or with reckless disregard, falsely represented to the underwriter of the Refinanced Stadium Bonds that the Baseball Stadium Project had generated $1.75 million of revenue in 2012, which was more than twice the actual (but undisclosed) results.

153.   The Refinanced Stadium Bonds had a guarantee structure akin to the original Stadium Bonds, whereby the Town agreed to make payments of principal and interest directly to bondholders and the RLDC agreed to advance or reimburse the Town the funds to make those payments.

154.   The preliminary official statement and final official statement for the Refinanced Stadium Bonds misleadingly stated that these reimbursements were expected to come primarily from the RLDC's Baseball Stadium Project revenues.  St. Lawrence and Troodler, knowingly, or with reckless disregard, signed false representations to the underwriter that the official statement did not contain any untrue statement of material fact or any material omission, and Troodler, knowingly, or with reckless disregard, signed a false closing certificate stating that, to the best of his knowledge, the final official statement did not contain any untrue statement of material fact or any material omission.  Klein also represented to the news media that Baseball Stadium Project revenues would "be adequate to pay the debt service" on the Refinanced Stadium Bonds.

155.   Those representations, knowingly or recklessly made by St. Lawrence, Troodler, and Klein, were misleading because they omitted the fact known to St. Lawrence and Troodler that the RLDC had actually lost $538,060 on non-baseball concerts and events in FY 2012, a component of Baseball Stadium Project Revenue that the RLDC previously trumpeted as a significant source of funds for debt service.

156.   Troodler, at St. Lawrence's direction, knowingly or recklessly compounded the omission in April 2013 by falsely telling a reporter that the RLDC had refinanced the Stadium

30

Bonds in February 2013 only to save on interest expenses and not because the RLDC's revenue stream was inadequate to make the bond payments.  The story was eventually published in *Newsday* and included Troodler's misrepresentation.

157.    St. Lawrence and Troodler knew, or were reckless in not knowing, that inadequate revenues were the primary reason to refinance the Stadium Bonds, but he and St. Lawrence determined to "sell" the information about the refinancing differently.

158.    By no later than about March 2013, St. Lawrence knew, or recklessly disregarded, that 2012 Baseball Stadium Project revenues were not even enough to cover stadium-related expenses.  Disclosure of that fact would have called into question the RLDC's ability to reimburse the Town for debt service payments on the Refinanced Stadium Bonds.  Accordingly, St. Lawrence omitted information about the RLDC's FY 2012 revenue shortfall from a May 24, 2013 placement memorandum, which stated that the RLDC was required to reimburse the Town for future debt service payments on the Refinanced Stadium Bonds.  The omission made the placement memorandum misleading.  Nevertheless, St. Lawrence, knowingly or with reckless disregard, signed a false "Certificate of the Town Supervisor" dated May 28, 2013 stating that the placement memorandum did not contain any untrue statement of material fact or any material omission.

159.    In October 2013, St. Lawrence and Klein prepared a response to an inquiry from a Bloomberg News reporter falsely stating that RLDC "revenues have been sufficient to cover its debt service."

160.    In three official statements and placement memoranda between May 2014 and September 2015, the Town made additional false statements regarding the source of the RLDC's debt service reimbursements, leaving investors with a misimpression that the RLDC was

generating recurring revenues sufficient to cover the debt service on the Refinanced Stadium Bonds.

161.    In March 2014, the RLDC's first reimbursement payment was due to the Town on the Refinanced Stadium Bonds, but once more the RLDC lacked sufficient funds until three days before a payment to bondholders was due, when the RLDC sold a parcel of land, resulting in a one-time cash infusion.  The Town falsely claimed in a May 2014 placement memorandum that the source of the reimbursement payment was Ramapo Commons housing project revenues, which were recurring.  St. Lawrence, knowingly or with reckless disregard, signed a false "Certificate of the Supervisor" dated May 27, 2014 stating that the placement memorandum did not contain any untrue statement of material or any material omission.

162.    In September 2014, the RLDC was only able to reimburse the Town for its debt service because St. Lawrence, Troodler, and Klein arranged in August 2014 for the Town Board to approve a resolution authorizing the transfer of $695,000 from the Town to the RLDC to subsidize legal fees incurred by the RLDC.

163.    On around August 2014, the Town transferred $495,000 to the RLDC pursuant to this resolution, thus transforming the RLDC's bank balance from negative to positive.  At St. Lawrence's direction, Troodler did not use the funds to pay the legal fees but instead used them to pay the Town $557,000 for its debt service payment on the Refinanced Stadium Bonds due September 2014.

164.    Yet, in May 2015 and September 2015 official statements, the Town claimed that "[t]o date, Housing Project revenues had provided funds to the [RLDC] to make payments to the Town to fund debt service payments on the [Refinanced Stadium] Bonds."  St. Lawrence, knowingly or with reckless disregard, signed a false "Certificate of the Supervisor" dated May

26, 2015 stating that the May 2015 official statement did not any untrue statement of material fact or any material omission.  St. Lawrence, knowingly or with reckless disregard, signed a false "Certificate of Town Supervisor as to Final Official Statement" dated September 30, 2015 stating that, to the best of his knowledge, the September 2015 official statement did not contain any untrue statement of material fact or any material omission.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5(a) and (c) Thereunder**
**(Against the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein, and Oberman)**

165.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 164, as though fully set forth herein.

166.     By reason of the foregoing, the Town of Ramapo, St. Lawrence, Troodler, Klein, and Oberman directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed devices, schemes and artifices to defraud; and/or engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

167.     By reason of the foregoing, the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein, and Oberman singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### And Rule 10b-5(b) Thereunder
### (Against the Town of Ramapo, RLDC, St. Lawrence, Troodler and Klein)

168.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 164, as though fully set forth herein.

169.    By reason of the foregoing, the Town of Ramapo, St. Lawrence, Troodler, Klein, and Oberman directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

170.    By reason of the foregoing, the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein, and Oberman singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 17(a)(1) and (3) of the Securities Act
### (Against the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein and Oberman)

171.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 164, as though fully set forth herein.

172.    By reason of the foregoing, the Town of Ramapo, St. Lawrence, Troodler, Klein, and Oberman directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly (or, for Section

17(a)(3) of the Securities Act, negligently), have employed devices, schemes, and artifices to defraud and/or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities offered and sold by the Town of Ramapo and the RLDC.

173.   By reason of the foregoing, the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein, and Oberman violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act.  [15 U.S.C. §§ 77q(a)(1) and (3)].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against the Town of Ramapo, RLDC, St. Lawrence, Troodler, and Klein)

174.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 164, as though fully set forth herein.

175.   By reason of the foregoing, the Town of Ramapo, St. Lawrence, Troodler, and Klein directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly, or recklessly, or negligently, obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

176.   By reason of the foregoing, the Town of Ramapo, RLDC, St. Lawrence, Troodler, and Klein violated, and unless enjoined will continue to violate, Sections 17(a)(2) of the Securities Act.  [15 U.S.C. §§ 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF

**Control Person Liability for the RLDC's Violations of Section 10(b)
of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder
and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against St. Lawrence and Troodler)**

177.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 164, as though fully set forth herein.

178.    At all times relevant hereto, St. Lawrence and Troodler, directly or indirectly,

controlled the RLDC for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

179.    By engaging in the conduct alleged above, St. Lawrence and Troodler are liable

as control persons for the RLDC's violations of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. 240.10b-5(a), (b) and (c)] and

Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3).].

## SIXTH CLAIM FOR RELIEF

**Control Person Liability for the Town's Violations of Section 10(b)
of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder
and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against St. Lawrence)**

180.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 164, as though fully set forth herein.

181.    At all times relevant hereto, St. Lawrence, directly or indirectly, controlled the

Town of Ramapo for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

182.    By engaging in the conduct alleged above, St. Lawrence is liable as a control

person for the Town of Ramapo's violations of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. 240.10b-5(a), (b) and (c)] and

Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

**SEVENTH CLAIM FOR RELIEF**

**Aiding and Abetting Liability for the Town's Violations of Section 10(b)
of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder
and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against the St. Lawrence, Troodler, Klein, Oberman, and the RLDC)**

183.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 164, as though fully set forth herein.

184.    As alleged above, the Town of Ramapo violated Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b)

and (c)] and Sections 17(a), (2) and (2) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and

(3)].

185.  St. Lawrence, Troodler, Klein, Oberman, and the RLDC knew, or recklessly

disregarded, that the Tow of Ramapo's conduct was improper and knowingly rendered to the

Town of Ramapo substantial assistance in this conduct.

186.    By reason of the foregoing, St. Lawrence, Troodler, Klein, Oberman, and the

RLDC aided and abetted the Town of Ramapo's violations of Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and

(c)] and Sections 17(a), (2) and (2) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

**EIGHTH CLAIM FOR RELIEF**

**Aiding and Abetting Liability for the RLDC's Violations of Section 10(b)
of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder
and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against the St. Lawrence, Troodler, Klein, Oberman, and the Town of Ramapo)**

187.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 164, as though fully set forth herein.

188.    As alleged above, the RLDC violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a), (2) and (2) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

189.  St. Lawrence, Troodler, Klein, Oberman, and the Town of Ramapo knew, or recklessly disregarded, that the RLDC's conduct was improper and knowingly rendered to the RLDC substantial assistance in this conduct.

190.    By reason of the foregoing, St. Lawrence, Troodler, Klein, Oberman, and the Town of Ramapo aided and abetted the RLDC's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a), (2) and (2) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently enjoining the Town of Ramapo, the RLDC, St. Lawrence, Troodler, Klein, and Oberman from committing and/or aiding and abetting the violations of the federal securities laws alleged against them in this complaint;

### II.

Permanently enjoining St. Lawrence, Troodler, Klein, and Oberman from participating in an offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security;

**III.**

Requiring the Town of Ramapo and the RLDC to retain and implement any recommendations made by an Independent Consultant appointed by the Court (a) to review and recommend improvements to the Town's financial reporting procedures and controls and municipal security disclosure policies and procedures and (b) to monitor the Town's and the RLDC's implementation of any such recommendations no less than biannually for a period of five years;

**IV.**

Requiring the Town of Ramapo and the RLDC, for a period of five years, to retain an Independent Auditing Firm not unacceptable to the Commission staff, to conduct audits of the Town of Ramapo's and RLDC's annual financial statements through the expiration of the auditing firm's five-year term;

**V.**

Enjoining the Town of Ramapo and the RLDC, for a period of five years, from engaging in the offer or sale of Town of Ramapo or RLDC municipal securities unless, prior to doing so, they retain and cooperate with an Independent Disclosure Counsel not unacceptable to the Commission staff, whose duties would be to make recommendations designed to ensure that any applicable offering documents are accurate and complete and to ensure that the terms of any final judgment in this case are disclosed in any such offering documents;

**VI.**

Ordering the Town of Ramapo, RLDC, St. Lawrence, Troodler, Klein, and Oberman to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## VII.

Granting such other and further relief, including equitable, as the Court may deem just

and proper.

Dated:  April 14, 2016
        New York, New York

Andrew M. Calamari
Sanjay Wadhwa
LeeAnn Gaunt (Not admitted in SDNY)
Celeste Chase
Alexander M. Vasilescu
Daniel M. Loss
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York  10281-1022
(212) 336-0178 (Vasilescu)
vasilescua@sec.gov

Appendix – Relevant Securities Offerings

| Issuer[1] | Guarantor | Date of OS/PM[2] | Description | Maturity Date(s) |
|---|---|---|---|---|
| TOR | N/A | 9/21/10 | $12MM Public Improvement Bonds | 9/1/11 – 9/1/22 |
| TOR | N/A | 10/27/10 | $1.505MM RANs | 11/1/11 |
| | | | $1.240MM BANs | 11/1/12 |
| | | | $3.960MM BANs | 11/1/13 |
| TOR | N/A | 12/7/10 | $5MM BANs | 12/13/11 |
| | | | $15MM Federally Taxable BANs | 12/13/11 |
| | | | $400k RANs | 12/13/11 |
| RLDC | TOR | 4/15/11 | $25MM Revenue Bonds | 3/15/16 |
| TOR | N/A | 6/1/11 | $15MM BANs | 6/1/12 |
| TOR | N/A | 9/27/11 | $14.2MM BANs | 10/1/12 |
| TOR | N/A | 11/30/11 | $19.855M BANs | 12/5/12 |
| TOR | N/A | 5/24/12 | $15MM BANs | 5/29/13 |
| TOR | N/A | 9/21/12 | $3.985MM Public Improvement Refunding Bonds | 6/15/13-6/15/16 |
| | | | $18.045MM BANs | 7/1/13 |
| TOR | N/A | 11/28/12 | $19.33MM Public Improvement Bonds | 11/1/13 – 11/1/35 |
| RLDC | TOR | 2/7/13 | $24.335MM Revenue Refunding Bonds | 3/15/15 – 3/15/41 |
| | | | $665k Federally Taxable Revenue Bonds | 3/15/15 |
| TOR | N/A | 4/5/13 | $1 MM Public Improvement Bonds | 3/1/14-3/1/28 |
| | | | $11.245 MM Public Improvement Refunding Bonds | 3/1/14-3/1/34 |
| TOR | N/A | 5/24/13 | $31.2MM BANs | 5/28/14 |
| TOR | N/A | 5/21/14 | $2.495MM Public Improvement Bonds | 5/15/24 |
| | | | $33.175MM BANs | 5/27/15 |
| TOR | N/A | 5/19/15 | $33.345MM Public Improvement Bonds | 5/15/16 – 5/15/28 |
| TOR | N/A | 9/11/15 | $5MM Public Improvement Bonds | 5/1/16 – 5/1/26 |
| | | | $8.44MM Public Improvement Refunding Bonds | 5/1/16 – 5/1/26 |

---

[1] TOR is an abbreviation for the Town of Ramapo.  RLDC is an abbreviation for the Ramapo Local Development Corporation.
[2] OS is an abbreviation for Official Statement.  PM is an abbreviation for Placement Memorandum.